Sarodjiny Carlwig v. Sarodjiny Carlwig The central issue in this case is the quote habitual residence of two young children under the Hague Convention on the Civil Aspects of International Child Abduction. The district court held that 10-month-old girl ERSC and 6-year-old boy ALC were both habitually resident in Sweden and ordered them returned to that country. At that time, the children had been living in the United States with their mother, all three of them American citizens, for more than a year, at least six months of that time, with the express consent of their Swedish father. The children were not habitually resident in Sweden. Well, now they've been back in Sweden for quite some time. What is it that you're asking us to do? I'm asking you to reverse the judgment of the district court, which is a return order to Sweden, and to remand to the district court with instructions to enter a re-return order, that is, to cancel the effect of the district court's order by returning the children to the United States. So for 10-month-old girl ERSC, she had never been to Sweden when the district court ruled that she was habitually resident there. She was not resident in Sweden in any sense of that. Let me go back to that for a moment. So we order a re-return to the United States pending a re-hearing in the district court regarding where the children's habitual residence was at the time of the removal from Sweden. So if the decision in the district court goes against your client again, then put them back on a plane back to Sweden. That's potentially true, yes, Your Honor. But the argument that we're making for ERSC is that as a habitually resident in Sweden when she was sent there, so we're not expecting any further proceedings as to ERSC. ALC, we believe, acclimated in the United States such that when he was returned to Sweden, he was not a habitual resident of that country. And so it's possible that further proceedings would be necessary for ALC, especially in light of the procedural errors made by the district court in this case. But at least as to ERSC, our argument is that as a matter of law, it's not possible that she was habitually resident in Sweden. As this court stated in Moses, quote, habitual residence cannot be acquired without physical presence. And so if we look at the application of the two-step Moses test to ERSC in this case, the first step of the Moses test looks to the country that the petitioning parent wants the child returned to, here, Sweden. It then asks, has the child lived in that country with the shared settled intent of both parents? ERSC in this case never lived in Sweden at all, much less with the shared settled intent of her parents. And thus, essentially, habitual residence in Sweden never attached for ERSC. She had never been there. She was never habitually resident there. Now the same two-step Moses test applies to six-year-old boy ALC. And ALC, who had lived in Sweden for a period of 13 months after spending the first four years of his life in Dubai, ALC acclimated in the United States, such that he was no longer habitually resident there when he was returned to that country. So acclimation, essentially, the question is, did the United States supplant Sweden as the locus of ALC's development? And for several reasons, that is what happened here. First, a year is a substantial period of time in the life of a five- to six-year-old boy. He went to kindergarten in the United States, which is a significant educational and cultural experience. Very importantly also, the United States is his mother Sarah's home country. And so what we really have here for ALC is he's born in Dubai, his first four years in Dubai, then 13 months in his father's home country, then a year in his mother's home country. And so when you look at his experiences there, the district court should have asked itself, did the United States supplant Sweden as the locus of ALC's development? And procedurally, the district court did several things that essentially prevented it from ever even undertaking a proper analysis of that point. Now, if we do remand, then upon remand, can the district court consider evidence that the children are now acclimated, ALC is now acclimated back in Sweden? Or does everything go back to the status quo as of the time that the district court ruled in this case? I think everything goes back to the status quo when the district court ruled in this case.  Reviewing the ruling entered by the district court last April, the question essentially is, was the analysis done properly then? And if not, on remand, to do it properly now, I don't believe that the time when the children should not have been in Sweden should count toward the acclimation. In other words, the question even on remand would be, were the children or was ALC habitually resident in Sweden or the United States when he was originally sent back there? So the procedural errors of the district court here. The first one is that the district court never identified a date when ALC was alleged to be wrongfully retained in the United States. And that under the Moses is sort of the first little bit of the first step of the Moses test. And the reason is that to determine whether one country has supplanted the other as the locus of the child's development, it's important to determine, you know, what period of time you're making that comparison for. So that the district court did not do. Even more importantly though, the district court mistook evidence of ALC's acclimation in the United States for evidence of the well-settled defense, which is not applicable here. That's a affirmative defense under the convention. Kicks in only after a year after the wrongful retention. And so because the district court was thinking the well-settled defense doesn't apply here, he steered the witnesses, the mother's witnesses, away from talking about ALC being well-settled in the United States. But in so doing, the judge also prevented itself from hearing and considering evidence that ALC acclimated in the United States. Which of course goes to the father's element of habitual residence. And you can see this on the face of the district court's opinion. On page 3 and I think again on page 11, the district court is discussing the ties that ALC made during his time in Sweden. But there's no comparable discussion of the ties that ALC developed during his time in the United States. There's no meaningful analysis thus of whether the United States supplanted Sweden as the locus of his development. There's one other point I'd like to make before reserving my time, which is that the custody proceedings in Sweden, as you mentioned, have been ongoing for the past almost year. And we are concerned that... What's the status of those proceedings? Yes, Your Honor. So apparently there were filings as recently as on Friday of this past week. And it looks like a recommendation has been made but no final custody order has been entered. And the recommendation, and this is translated from Swedish, so this is my understanding. But the recommendation is that the father be granted sole custody of the children. And that that recommendation is based in significant part on the Swedish court looking to the district court's opinion here. And saying, well it looks like since the mother was found to have abducted the children that she can't be trusted with them. And so our concern is that possibly as early as sometime in April, based on how the deadlines roll out from now, that there could be a final custody order in Sweden. And so we would urge this court, if it believes that this appeal has merit to... With her husband, when she asked her husband if she could come over here and have the baby, the little girl. Correct. And if she could bring the boy. And that she'd be here to have the child and she would go back in about four or five months. And he bought the tickets for her, the airline tickets and all the rest of it. Is that disputed? So it's not disputed that the mother and father agreed on a six month stay in Los Angeles. During which time she gave birth to ERSC. But the parents never agreed, your honor, on what would happen after the end of that six months. And you can see the district court in its opinion talking about this. They talked about moving to Dubai. And in fact, there's an email from father to mother from before the mother even came to the United States. And it's quoted in the red brief on page four. Where the father says, you know, you say after Los Angeles you'll join me in Dubai. But our marriage isn't working that well. How do I know that'll happen? So you see that in the district court's opinion, they're talking about moving to Dubai. They're talking potentially about moving to New York. The father agrees to do it, but there are conditions on that that never get satisfied. So what we really have here from the perspective of parental intent. Is disagreement between the parents about where the child and children should permanently live. They settle on six months in Los Angeles. And essentially they kick the can down the road about what they're going to do permanently. And after the end of that time, you see them negotiating about that. But they never really reach agreement. And so why that matters to us is first there's no question agreement on six months in Los Angeles. And the open negotiations thereafter about where in the world the family would live. Support ALC's acclimation in Los Angeles during that time. Let me ask you this. The district court was very concerned about splitting the kids up. And I think he even said it was untenable that the analysis wouldn't flow the same way as to both of the children. Now, if the law requires that the analysis be done separately, but the evidence is mixed. Such that some of the district court's adverse credibility findings against your client with regard to the older child ALC stands. But the analysis differs as to the baby because of the lack of physical presence in Sweden. As a practical matter, is your client asking that the analysis be split such that one child may actually end up in one country and the other child end up in another? That's right, Your Honor. The analysis of the two children, exactly as you said, is separate. And it makes perfect sense because the convention is talking about the habitual residence of a child, each child. Here the life experience is different. The reason I ask that is that the law and what's legally required may be one thing. But a lot of times the parents don't want that resolution. So I wanted to clarify what it is that your client is asking for. Yes. So my client is asking for a separate analysis of the habitual residence of each child. And we acknowledge the possibility that what that means is that ERSC was not habitually resident in Sweden. And we believe ALC wasn't either, but for different reasons and they're separate. And again, though, to keep in mind under the purposes of the convention, you know, the convention... Why, you know, how many months have passed since the children went back to Sweden? They went back to Sweden, I believe, in early May, so almost 10 months now. And the husband told the wife, after the decision, come back to Sweden. We'll have the determination of who has custody made in Sweden and I'll pay all the expenses. You'll be living there, the children will be with us. But she didn't go. And right after that he went back with the children, didn't she send him a letter about her love for him and the family? What a wonderful time they had together. Okay, so... Did that happen? They're two separate incidents. Did that happen or not? I mean, you can't take people's lives and chop them up this way and that way. You know, it's kind of a continuum. Yes. So, but she did write to him and tell him all that. And that was after he visited Los Angeles and then went back to Sweden himself while the wife and children stayed here. So that wasn't at the same time as after the hearing when the children were sent back and she had the opportunity to go back. And she did not go to Sweden immediately with the children under the district court's order. But she did go, I believe, just a month later. She went to Sweden and has spent significant time in Sweden since, attempting to see and be with her children. Where is she now? She is sitting in the courtroom. So she's been living in Sweden? Is that what you're telling us? She has been in different places. I'm not sure she's been living in Sweden, but she's spent significant time there in these intervening 10 months when she's able to see her children. Did she participate in the custody proceedings in Sweden? Yes, and I believe she has essentially a Swedish version of legal aid counsel representing her. But, yeah, she's participating in the proceedings. So they've had the hearing in Sweden. She was there and she had counsel in Sweden. Yes, Your Honor. And it's been adjudicated almost to the final stages? My understanding is that there is no final order but a recommendation has been made, and I think in custody proceedings that's sort of how it goes. And the recommendation is sole custody for the father on the basis of her illegally keeping the children in the United States, which is the ruling that we're asking this court to reverse. So we think that it's very important. We're hopeful that it's very important that what happens here will be very influential in the Swedish court, but that is steps down the road. So we would ask this court to reverse the judgment of the district court, reverse the return order, and remand with instructions. How much time has she spent in Sweden during this interim period? I'm not sure, Your Honor. That's your client. You're supposed to know this. I apologize. I mean, I know that I have corresponded with her from Sweden a fair amount, including in the past few weeks, and I believe that she came here for this. Is this the first time we're learning about this, her residence in Sweden during the past 11 months? Well, Your Honor, she went to Sweden because the children were sent there. Well, I'm asking you, is this the first time we're learning about this? Yes, Your Honor, it is. So you've kept information that's relevant from us. I don't agree with that, Your Honor. Why? Because... I mean, I've assumed reading all this that she's still here in Los Angeles, wondering, why is she here? Why isn't she in Sweden? So that's what I assume. Well, her traveling to Sweden was in response to the district court's erroneous order. I mean, she did what a mother would do under those circumstances, which was when the children were sent to Sweden, she followed in an effort to have custody of the children. And that doesn't change the fact that the district court erred in ruling that the children were habitually resident in Sweden when they were not, or the fact that the custody adjudication should be made and should still be made in the United States. Well, this was a tough case and a tough call, wasn't it? Yes, it's a tough case, Your Honor. Thank you. Bye. Thank you, Your Honor. May it please the Court, Philip Parrish on behalf of Mr. Carlwig, seated to my right is Lawrence Katz. Judge Brakerson, I also attended University of Virginia School of Law, so we have a little bit of an anomaly this morning. My daughter graduated from University of Virginia School, and she used to work at L. Joe's. Oh, sure. Yeah. I've even got one of their ties home. So, anyway. I will stipulate that Mr. Fitzgerald did better at law school than I did there. He went to medical school there, and not at University of Virginia, but at Virginia Commonwealth University. Oh, yes. She lived in Richmond. Medical College of Virginia. Yeah. It's a nice place now. Yes, it is. Okay. All right. Your Honors, 15 years ago in Moses, this Court acknowledged that the purpose of the Hague Convention is that it is designed to prevent child abduction by reducing the incentive of the would-be abductor to seek unilateral custody over a child in another country. The Court also observed that the greater the ease with which habitual residents may be shifted without the consent of both parents, the greater the incentive to try. And that the test that was adopted by this Court in Moses is contrary to what was adopted by the Sixth Circuit in Friedrich, which is a test that's based on physical presence. The Moses test is not, and Moses does not state that you must be physically present, because Moses focuses on what's the weirdest thing. We had a case called Solomon, and he could maybe help us with that. Your Honor, when you were questioning counsel, King Solomon came to mind, and I'll try to have some comments about that a little bit later. What Moses commands the District Court to do, and what the District Court did, was to look at the last mutual settled intent of the parents, which in this case was unquestionably Sweden. And on the issue of acclimatization for the older child here, there were three or four points made by this Court in Moses, and echoed last year by this Court in Murphy, that show why the District Court correctly found that the four-and-a-half-year-old or four-and-three-fourths-year-old when he moved here, and five-year-old at the time of the hearing child, the son, should not be found to have been acclimatized. First of all, in Moses, the Court held in the absence of a settled parental intent, which is undisputed. There was no settled parental intent to move to Los Angeles. Courts should be slow to infer from such context that an earlier habitual residence has been abandoned. And the Court also said in Moses, the function of a court applying the convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life, going back to the purpose of the convention. So this Court said in Moses, accordingly, it will take a considerable period of time for a child to acquire a new habitual residence after a wrongful removal. And in terms of the type of evidence that's necessary, the Court went on to say, in the absence of shared parental intent, which we do not have here, a prior habitual residency should be deemed supplanted only if the facts point unequivocally to that conclusion. So the best … But there were some attempts in the District Court to present evidence that would demonstrate no shared intent to settle in Sweden, and the District Court blocked some of that evidence. So it didn't come in. What are we to do with that? Well, Your Honor, I'm not certain that the District Court did block any of the evidence. There was no ruling that the petitioner could not present any witness or any evidence. When she got out her argument that she did not want to stay in Sweden, the only evidence she had was her own testimony, and she gave that testimony in a narrative fashion that she never wanted to stay in Sweden. But the move from Sweden, from Dubai to Sweden, falls within Category 1 at best for the mother. At worst, it's clearly an abandonment of Dubai and a desire to move to Sweden. And the reason, therefore, of course, is a reason that is often the case, and that's one of economics and one of the job. Mr. Carl Wicke worked for the same Swedish company from the time that they were married, the company that had an office in Dubai and then closed that office, and then he was transferred to Sweden, his home country. And in Moses, this court said that one of the things that you look at to determine whether there is a settled intent to leave one habitual residence, that being Dubai, where they were for three years, is did you abandon it? Yes, they did. Nothing in Dubai. And second, what's the basis for wanting to go there? And the court said education, business or profession, employment. All of these are reasons. And the court says all that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled. The court went on to say you don't intend to leave your bones there, but this is, again, Mr. Carl Wicke's home country. It's the home country of the corporation that he was working for and has been working for from 2008 or earlier through to today, certainly on the record through the date of the hearing in this case. And so there was significant proof that that was, in fact, their settled intent. The best case scenario for the mother is that this is a Category 1 situation as described in Moses, which is where there's clearly a move, a settled intent by virtue of the job and that sort of thing, and they lived there for a year before she was allowed to leave temporarily by agreement with her husband. And in that case, this court in Moses says it almost always is found that that is a habitual residence, the place where even if you say, if you take her evidence at best, face value, that she had some qualms about going to Sweden, that's a Category 1 case under Moses, and Sweden under that is clearly a habitual residence. Let me ask you, would you say that Sarah had a fair trial before the district court? Yes, Judge Bregerson. I do believe she had a fair trial before the court. There have been a lot of things that were said in the opening brief where they only presented a few snippets of the testimony to this court. We presented the entire trial transcript in our record excerpts, and I think if you read the entire trial transcript. But did he, the district judge, he held an initial hearing over the telephone, and there was, I understand, what I gather was he made no attempt to contact her. She was handling her own case, and he went on and spoke with your client's attorney. Judge Bregerson, the hearing that you're speaking of, and again, we provided you with that transcript, was simply a status conference. The mother did not appear possibly because she had simply been served the day before. All that was talked about there was some preliminary issues about scheduling. There was nothing of substance there. You're not supposed to do that, are you? You're supposed to talk to the attorney for one party and have the other present? But again, she was not present. We don't know. The record doesn't reflect why she was not present, but there was a court reporter there. There was nothing of substance about the case discussed. It was simply a scheduling hearing, and there was nothing that went into any of the issues in the petition whatsoever. So that transcript, I think, stands on its own that there was, you know, the judge has a hearing. What attempt was there to contact Sarah? Your Honor, I don't know that answer. I'm sorry. And then wasn't she threatened with jail for not giving up the family's passports to the district attorney and cut off when she tried to explain that she had turned in the passports? And then wasn't she warned against lying and penalties of perjury and all that? She was, in fact. But, again, yes, Your Honor, there were some stern comments made by the district court because the district court was informed there was a lot of uncertainty as to where the passports were. In a case like this, that's a very important issue, especially when you're dealing with the ---- But she told the court where the passports were. But there had been a lot of uncertainty. Well, she did not know exactly where they were, and there was no confirmation as to where they were. They were at the district attorney's office. But he didn't get a letter until later that day from the district attorney's office confirming that. And what happened was Mr. Crawley's state court attorney may have misspoke. He said that I don't have any confirmation that they got it. I don't think he misspoke about that. He didn't have confirmation. But she was given a lecture on perjury, wasn't she, and the penalties. Right. And subsequently, when that matter was cleared up, the district court apologized to her. Well, that's a nice way to start out a trial. Sure. Because there was a concern that was raised about whether the passports had been secured, a very important issue in a case like this. The judge did later say ---- I'm sorry, Your Honor. Yeah, go ahead. The judge did later, when the letter was delivered to him by the district attorney's office that day of the proceedings, announce that on the record and said that it's over, and he said, I'm sorry, that issue's closed now. But throughout the case, he also was helpful to Ms. Crawley at times. He allowed her to testify in a narrative fashion from her own notes, saying that might be easier for her. He actually gave her help in terms of trying to help her cross-examine her husband, and the mother's counsel suggested that was him berating her or deriding her for representing herself when he, in fact, was trying to help her form questions versus she began to testify instead of asking questions of her husband when she was cross-examining her. And she's not, you know, the typical pro se litigant because she does have a law degree, not from the University of Virginia, but I believe somewhere in France, and she is licensed to practice in France, she told the court at the beginning. So although, you know ---- But they have a different legal system there. Sure. You know, they're ---- Right. But there was no ---- there were a few brusque comments, and even a couple of brusque comments directed toward Mr. Katz in terms of, you know, speeding along and telling Mr. Katz not to BS the court when he said it was an honor to be there. So, I mean, this judge spoke to both parties sometimes in a brusque fashion but did not impede Ms. Crawley from presenting her case. In fact, she significantly presented her case and made her argument and told him at one point, Judge, you know, you can't do this, what I think you're about to do, because I've talked to every Hague lawyer in town, and they tell me because my daughter was born here that you can't order her back. So this, again, this was not some unknowing pro se litigant who got taken completely off her game. He told her you can present evidence on habitual residency, on what the petitioner has presented, and you can present evidence on your affirmative defenses. So, Your Honor, I don't think it's fair to say to this district court judge that he precluded the petitioner from presenting her case because she did, in fact, present it. But as I read to you before, the case law on this ---- Did he cut her short testimony of one witness? Well, they suggest that he did not permit her to call Lloyd Kurtz, the gentleman who she, you know, says is sort of like her surrogate father. But the record doesn't say that Lloyd Kurtz, who the record, she suggests is sort of like a surrogate father, but she never called him to stand. I'm sorry. Quotation marks, Your Honor. I apologize. You have to use both. Right. I have a tissue in one hand. I apologize. Otherwise, it's an open-ended court. What was the proffer as to what Lloyd Kurtz was going to testify to? Because he was barred from testifying at all, right? Well, he wasn't barred. The court ---- He ended up not testifying, so was there a proffer as to what he was going to testify to? All that was read out was something that he was going to testify about, whatever she had put down on her petition in describing the witnesses. But then she called Madison Gray and her friend Noreen immediately after that, and she wasn't precluded from calling Mr. Kurtz. She didn't call him. He was there. The record doesn't say you may not call this witness. So, to me, it's ambiguous at best as to whether he precluded a single witness from being called. And, you know, I don't know what he was going to testify to other than maybe what he observed in terms of, you know, the child being settled, I guess, or acclimated. But, again ---- Let me ask you, since your time is running short, regarding the baby E.R.S.E., is there any case that stands for the proposition that you can acquire a habitual residence without a physical presence in that country? Yes, Your Honor. We've cited to the French case ruling number 1015. What about a United States case? Well, I would suggest to you that if you apply Moses to the factual scenario here, then you come up with a conclusion that the district court did. Because the issue is really not Moses and most of the circuits don't go by a pure physical presence. So there's no case that's held that so far. You're asking us to extend, essentially, the law because you're arguing that this is a different factual situation. Well, and I don't ---- It's not ---- It is applying the existing law to a new factual situation. But the beauty of the Moses test is that it both provides fidelity to the purpose of the convention, which is to preclude behavior such as what occurred in this case, and it also gives the flexibility of applying it to many different factual scenarios. So you look at ---- You're focusing on what the parent's intent is. If the parent's intent is that they have a settled intent to be in Sweden and there's only a permission to travel abroad for a period of time to give birth, then there's been no change in that. And the fact that the child is not physically present and, therefore, can't be ---- I'm sorry, I'll use these again ---- returned to in the usual sense of the word return, that's not reading the convention the way it's intended to be. Because the convention doesn't define habitual residence, and it says don't use a rigid application. I mean, we have situations ---- The court did rely on Delvoy, which was a situation where, yes, the child had been in ---- was in the United States because the mother brought him back to the United States after giving birth in Belgium. But newborn children don't acclimate anywhere, and that's basically the case law. You don't have to have a physical presence. In fact, that's what Friedrichs holds, but Moses doesn't say that. This court's precedent and most of the circuits in this country utilize the shared mutual intent of the parents because otherwise you can have a situation like this. You can incentivize mothers to do this, to go give birth to a child elsewhere under the guise of I'll be more comfortable there or, as in the Delvoy case, you go somewhere else to have the child because maybe it's cheaper there. What Moses teaches us is that we look at what the last shared settled intent of the parents was. That can be applied in this case that their shared settled intent was Sweden and that, therefore, the child should be returned to Sweden even though metaphysically, obviously, the child has not been to Sweden before. Otherwise, you're incentivizing the mother to do this or, conversely, if you hold that you have to be physically present, then you're incentivizing someone in my client's position, Mr. Kralvig, to go instead of instituting a divorce in Sweden and instituting these proceedings to come try and take the newborn back to Sweden with him and say, all right, now I've got both kids in Sweden and now you try to take them. I've been listening to parades of horribles for a long time and I'm still never frightened, you know. But the fidelity to the purpose of the convention, Judge Briggers, and I understand that we're dealing with this case. She was even told, wasn't she, while she was on the witness stand that her credibility was irreparably damaged. Well, yes, but that's the district court's call. The district court, before she took the stand, had all the materials that were provided. He had read everything. He understood that she's making these claims, these ghastly claims of being raped by her husband, you know, a couple weeks before she sends this tender email. So he, you know, he's the finder of fact here. He's not sitting, there's no jury over there. He's the finder of fact. He's entitled to make credibility determinations and so. Well, he did it right in the course of the trial when she was testified. So he turned to her and said your credibility has been irreparably damaged. Well, by her actions, by her deeds, by her words, yes. Yes. And he was right. The record reflects that he was right. And this court gives deference to his factual findings and to his credibility determinations. So that happens quite often, does it, in trials where a judge turns to a witness and says your credibility is irreparably damaged? Well, I think on bench trials it can happen. Now, many judges aren't as, perhaps, as brusque or forthright as Judge Wright was in this case. But that doesn't mean that it wasn't a basis. There is a basis in the record for his observations. The behavior of the mother throughout this case, the way that she, the story she was telling versus what the real-time email showed, for instance. I mean, she's somebody who was already sued for divorce and then when, and doesn't tell her husband. Then when he tells her in a timely fashion, she sends him an email and says, oh, my goodness, how could you possibly do this? Is this the way you do it in Sweden? You told me you would never divorce me. Meanwhile, she's trying to coax him to come to Los Angeles so she can find out where he's staying so she can have him served with a TRO where she alleges that he raped her, you know, like two weeks before she sent the email, about how nice it was that he initially didn't want to be tender with her and then his heart opened up when she. So, yes, there was plenty of evidence in this record for the court to draw the conclusion and there's nothing that precludes him from telling her that I find your credibility to be lying. If there are no further questions, I'm going to ask that the district court's decision, which followed the Moses roadmap, the Moses analytical framework to the T, especially with respect to the son and then the framework works in this instance with respect to the daughter because it focuses not on physical presence, which is what Friedrichs focuses on, and Moses never says that you have to be physically present. It was actually criticizing the Friedrichs court at the time it made the statement at least 1080 to the opinion. I know you didn't advise the court that these proceedings were going on in Stockholm. Well, we didn't advise the court because it was my understanding on appeals, typically the records close, but I will tell you that there have been proceedings going on that at times Mrs. Korweg's been in Sweden, at times she's been living in France. She's not been here in Los Angeles where she wanted to move the children to, but she's been and she initially agreed to the divorce over there. Then she appealed it. That was affirmed. There was a temporary order entered. She's appealed that. That was affirmed on custody and it was a full home study. The court over there didn't rely on what Judge Wright did here. The court had a complete home study over there, and then the court made their own findings based upon the behavior of the mother. So we don't want to hide from what's going on in Sweden. What's going on in Sweden has done nothing but, in our opinion, prove that Judge Wright made the right call here. Yeah, you didn't think it would be appropriate to let us know what was going on. We'd be happy to do that, Judge Pregerson. We can do a letter to you. No, I mean, you know, while it was going on. We were totally in the dark. Okay. I apologize, Your Honor. I didn't know that that was an appropriate thing to do. I certainly would have done it. We have nothing to hide with respect to the proceedings that are going on in Sweden, and we'd be happy to provide the court with a full report in letter form pursuant to local rules. No, we've already gotten a full report, more or less. Are there any further questions from the court? No, I don't think so. Thank you. We'd ask you to affirm in all respects. Thank you. Rebuttal? I just have a very brief couple of things, Your Honor. The Moses test and parental intent and the first step of the Moses test. In Moses and in virtually all of these cases that have described the Moses test as simply beginning with parental intent, in virtually all of those cases, all of them that I'm aware of, the child has previously lived in two places, and the question is framed as, you know, which of these places is the habitual residence of the child? The right way to view the first step of the Moses test has applied to the little girl here, ERSC. She's born in the United States. She's only ever been in the United States. And the really, let me put it this way. Often people try to disprove habitual residence in one country by proving that it has arisen in another. So that's ALC in this case. We're arguing that he acclimated in the United States, and that's why he was not habitually resident in Sweden. But that's not the only way to prove a child is not habitually resident in a former country. Some people might argue that she was a resident of Sweden. Well, Your Honor. We're told that children, while they're in the womb, you know, they hear music, they hear voices. Yes, Your Honor. Things are going on. And that what they're subjected to can have a profound effect on their lives. Well, Your Honor, the simple answer is that a fetus in utero is not a child under the paid convention. And that's an exactly... Other than what? Is not a child as under the Hague Convention. And it's the same. It's the exact same thing in the Uniform Child Custody Jurisdiction Act, which is what some 48 or 49 states have adopted for parents moving between different states in the United States. Courts have repeatedly refused to identify a home state for a fetus or a child before the child is born. And essentially, you know, the wording of the convention, habitual residence... I'm asking you these questions because it's the first time I've ever been in contact with a case like this. It's a fairly unique case. I didn't realize there was a big body of law out there. Well, certainly. And there's a fairly famous case where the Bodie M case, where the skier and his girlfriend, Dora Fling, had a relationship in California. And she, seven months pregnant, decided to move to New York and enroll in Columbia University. So seven months pregnant, she moves to New York. He has no say in that. Two days after the child is born, she files for, you know, custody and support in New York. The court rules that New York is the child's home state. It's the only state the child has been to and is born in, and refuses to penalize the mother for her decision to move while pregnant. So the fact that a fetus is not a child under the Hague Convention really isn't that different from a fetus not being a child under the Uniform Child Custody Act, which there's substantial precedent about. So lastly, on the issue of the mother's credibility being irreparably damaged, and this is in the record, it's at ER 252, and the discussion goes on to 254. What the district court is actually talking about there, he had been asking her questions, she had been answering, he didn't like all the answers. But what they go on to discuss there is a piece of evidence, which was the father's consent note, which that's in the record at ER 111. And the father had written a consent note to travel with ALC to the United States. And the district court says, you know, in the alternative universe that I live in, there's another version of this note, a version that limits a period of time to four to six months. And he says, I saw it, I saw it, and they're hunting around in the record. It doesn't exist, and it later came out. Counsel for the father admitted that another version of the letter like that didn't exist in the record. So what you have at ER 252 is the district court saying your credibility has been irreparably damaged, and that is a thing that the district court was not correct about. And that supports remand if necessary to a different district judge in this case. So for these reasons, again, we would ask this court to reverse the judgment of the district court and remand with instructions for a re-return order to bring the children back to the United States. Thank you. Thank you. Let's thank both of you for your services in this case. Well argued by both sides.
judges: Pregerson, Fernandez, Nguyen